UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMANDA GRAFF and SEAN NICKLAS,
as Next Friends of A.N., a minor,

                    Plaintiffs,                         Case Number 25-10554

v.                                         Honorable David M. Lawson

CITY OF LINCOLN PARK and ANTHONY
KUPSER,

                    Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

It is not often that a dog bite case finds its way to federal court. The plaintiffs in the present matter, however, seek redress for serious injuries to their minor daughter by alleging a violation of the Constitution. The young girl went to the Lincoln Park police station where her father, plaintiff Sean Nicklas, worked as a police officer. She was bitten on the thigh by a trained police canine that was roaming free in the station. They sued the City and the dog's handler, defendant Anthony Kupser, alleging in their complaint a violation of the girl's right to bodily integrity that is protected by the Fourteenth Amendment, as well as state law claims. After discovery closed, the defendants moved for summary judgment, and the Court heard oral argument on June 9, 2026. The undisputed evidence establishes that the City did not violate the plaintiffs' federal constitutional rights, it is entitled to governmental immunity on the state law claims, Kupser is entitled to qualified immunity on the federal claim against him, and he cannot he held liable for the state law claims because there is no conclusive evidence that he (as opposed to the City) was the owner of the dog. Therefore, the Court will grant the motion for summary judgment and dismiss the case.

I.

The plaintiffs dispute some of the facts presented by the defendants in their motion papers. Others, however, are undisputed or unrebutted by the plaintiffs. The undisputed facts are set forth here, and the materiality of the disputed facts are discussed later.

A.

Defendant Detective Sergeant Anthony Kupser is an officer of defendant City of Lincoln Park's police department, and at the time of the incident was assigned a dog named Vale, a German Shepherd, to work in the field on police business. Kupser and Vale worked together as partners comprising a K-9 unit of the police department. Kupser and Vale attended "K9 Academy Training" and were certified for police duty by the National Association of Professional Canine Handlers. As part of that indoctrination, Vale was trained not to bite or jump on any person unless commanded to do so by Kupser. Vale also was trained to obey commands given by Kupser and not to obey any other person in the performance of his duties.

Kupser has an office at the police department, which is located in a secure area with keycard-controlled access. When Kupser was at work in his office, Vale stayed there with him in the office and was considered to be "on duty" at those times. On the morning of January 31, 2024, Kupser was the first officer to arrive for the scheduled shift change. When he arrived, he deposited his belongings in his office, and Vale went into the office and laid down on his dog bed. Kupser then went to the front desk of the station, leaving Vale unattended in Kupser's office.

Around that same time, fellow City of Lincoln Park Police Officer Sergeant Sean Nicklas, one of the plaintiffs, arrived at the station on a personal errand to exchange parental custody of his minor daughter, A.N., who was three years old at the time. Nicklas and A.N. entered the office area of the west wing through the back door. Vale approached A.N. and began to "sniff her and

- 2 -

put his face in her face." A.N. tried to back away, and Vale tried to jump on her. Nicklas tried to body block Vale to separate the two, and Vale then put his front paws on A.N. Nicklas and police department secretary Kristina Erdos began yelling at Vale to "leave her alone." Nicklas tried to pick up A.N., and Vale then bit A.N. on the right thigh. Kupser heard the commotion, came to the back office area, and secured Vale.

A.N. was taken to the hospital where surgery was performed. The surgery required at least 44 stitches to close the bite wound. She suffered severe nerve damage and scarring, and her injuries may require additional plastic surgery to repair. The experience left her afraid of dogs and afraid to be around the police station where her dad works.

B.

The plaintiffs offered additional evidence, which the defendants dispute.

*Prior Acts of Aggression by Vale.* The plaintiffs concede that there is no evidence of any other K-9 unit assigned with the police department having bitten a person, other than Police Chief Scott Lavis's vague recollection that at an unknown remote date a different K-9 in the department had bitten a person during a traffic stop under unknown circumstances. Lavis testified that he was not aware of any prior incidents in which Vale had bitten a person, including in particular that he was unaware of an incident where Vale bit another police officer.

The plaintiffs point to one other incident when Vale bit a person, which occurred on December 25, 2021, and was memorialized in a police report prepared by Kupser. Report dated Dec. 25, 2021, ECF No. 24-8, PageID.308. Kupser, describing the incident at his deposition, testified that he and other officers responded to a report of a burglary in progress at a commercial property where a burglar alarm was sounding. The officers did not know whether the burglar was still inside. Kupser was outside the south door of the premises with Vale in a "down" position. He yelled three times to anyone inside to surrender and come out. Fellow Officer Samson was at

- 3 -

the north door of the building, holding it open.  Kupser commanded Vale to enter the building and "apprehend," which is his command to search the building and bite and hold anyone located inside. Kupser dep., ECF No. 22-2, PageID.155.  When he entered the building, Vale spotted Samson and bit him on the thigh, leaving a small puncture wound.  Kupser immediately intervened and commanded Vale to release Samson, which he did.  Kupser opined that the bite resulted from the manner of conducting a K-9 search while a police officer was inside the building, which in his opinion was a mistake and contrary to department policy, since Vale was not trained to discriminate between persons during such an incursion and was specifically trained to bite anyone that he found inside the area he was commanded to search.  *Id.* at 155-56.

The plaintiffs also point to an incident that plaintiff Nicklas testified about at his deposition. According to Nicklas, after the incident with A.N., Nicklas was told by fellow officer Ryan Howe that a couple of weeks before the bite incident, Howe came to the police station with his own minor child, entered through the same door that Nicklas and A.N. had entered, and Vale "kind of charged" at them, but Howe picked up his daughter before the dog got to them.  Sean Nicklas dep., ECF No. 24-2, PageID.349.  The plaintiffs do not point to any evidence that the incident involved a bite or any injuries to the child.  Kupser recalled the incident at his deposition, but he testified that he only observed Howe's daughter running up and down the hallway, and he said that Vale was laying on his dog bed in Kupser's office, that Kupser told him to "stay" and he did, that he never saw the dog get up or bark or growl, and that he did not see the dog approach or "charge" anyone.  Kupser dep., ECF No. 22-2, PageID.169-70.

Finally, the plaintiffs also point to Nicklas's deposition testimony where he recounted speaking with retired Lincoln Park Police Chief Ray Watters, who told Nicklas that during a "trunk or treat" event at a local school (date and location unspecified), Vale had "grabbed on . . . the

- 4 -

sleeve" of a child's Halloween costume. Nicklas dep., ECF No. 24-2, PageID.249-50. However, Watters told Nicklas that the incident never was reported because the family of the child "was of Hispanic descent and didn't speak English and kind of didn't want anything to do with it." *Id.* at 250. At his own deposition, Kupser testified that on the occasion Vale only "barked or growled" at a child during a gathering for a group photograph, and that Kupser immediately told Vale "NO," and then put him in Kupser's vehicle. Kupser dep., ECF No. 22-2, PageID.167.

*Ownership of Vale.* Lincoln Park Police Chief Lavis testified that in January 2024, Vale was owned by the City of Lincoln Park. Lavis dep., ECF No. 24-4, PageID.284. Similarly, Kupser testified at his own deposition that in January 2024 Vale was "owned" by the City of Lincoln Park. Kupser dep., ECF No. 24-3, PageID.265. In their reply, the defendants also point to an "Agreement for Retirement of Police Canine Dog," which was executed by defendant Kupser and the Lincoln Park City Manager on January 24, 2025, which formally transferred "ownership" of the dog from the City to Kupser, on the occasion of the dog's retirement from police duty. *See* Agreement dated Jan. 24, 2025, ECF No. 25-2, PageID.353 ("TRANSFER OF OWNERSHIP. Upon retirement, the City shall relinquish all ownership rights to the K9 dog and *transfer ownership to the Handler*.") (emphasis added).

In rebuttal, the plaintiffs cite an excerpt of a brief in support of a motion for summary disposition that was filed by the City in state court before the case was removed, wherein the City argued that it could not be held liable under Michigan's dog-bite statute because it was "not the owner" of the dog. *See* Def.'s Brief, ECF No. 24-7, PageID.306. However, the exhibited portion of the previously filed brief does not cite any record evidence in support of the assertion about ownership of the dog. Nor does it state who they claimed owned the dog.

C.

The plaintiffs filed their complaint in the Wayne County, Michigan circuit court on November 20, 2024, and the defendants removed the case to this Court on February 27, 2025. The amended complaint pleads causes of action for (1) dog owner strict liability under Michigan Compiled Laws § 287.351, against both the City and defendant Kupser, (2) gross negligence against defendant Kupser under state law, (3) violation of the minor child's constitutional right to bodily integrity under the Fourteenth Amendment and 42 U.S.C. § 1983, against defendant Kupser, and (4) a *Monell* claim against the City of Lincoln Park, framed as a claim for "deliberate indifference" to the minor child's constitutional rights.

II.

The defendants raise several arguments based on various forms of immunity from suit, challenging both the state and federal claims. The City also contends that the federal claim against is must be dismissed because the undisputed evidence fails to establish any pattern of constitutional violations that occurred involving defendant Kupser and his dog, and the plaintiffs have not identified any decision-making individual who was aware of any supposed pattern of constitutional violations or ratified any such actions by failing to investigate or failing to impose appropriate training or discipline.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th

- 6 -

Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

The party bringing the summary judgment motion must inform the court of the basis for its motion and identify portions of the record that demonstrate that no material facts are genuinely in dispute.  *Id.* at 558. (citing *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)).  "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion."  *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

A.

We begin with the federal claim against the City of Lincoln Park.  The plaintiffs assert their claim under 42 U.S.C. § 1983.  Under that statute, individuals may seek redress in court against state actors for violations of rights secured by the Constitution and laws of the United States.  To state a claim under that section, "a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law."  *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)).  "When claiming damages for violations of constitutional rights, Plaintiffs 'must allege, with particularity, facts that demonstrate what each defendant did to violate the asserted constitutional right.'"  *Ondo v. City of Cleveland*, 795 F.3d 597, 610 (6th Cir. 2015) (quoting *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008)) (emphasis added).

The parties do not dispute that the defendants were acting under color of state law at the time of the incident, so the second element of the claim is satisfied. The plaintiffs base their argument supporting the first element — deprivation of a constitutional right — on the Fourteenth Amendment. The defendants contest that aspect of the claim.

"The Fourteenth Amendment provides that '[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law.'" *Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*, 141 F.4th 796, 804 (6th Cir. 2025), *cert. denied*, 224 L. Ed. 2d 274 (Mar. 23, 2026) (quoting U.S. Const. amend. XIV, § 1). The Due Process Clause has both a procedural component and a substantive component. The plaintiffs focus on the substantive part. "[S]ubstantive due process . . . 'bar[s] certain government actions regardless of the fairness of the procedures used to implement them.'" *Ibid.* (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). "It 'specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Ibid.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997)). "The liberty interests secured by the Due Process Clause include the right 'generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.'" *Ibid.* (quoting *Ingraham v. Wright*, 430 U.S. 651, 673 (1977)). "The Supreme Court has held that these common law privileges include the right to bodily integrity." *Ibid.* (citing *Rochin v. California*, 342 U.S. 165, 172 (1952)).

"'[I]ndividuals possess a constitutional right to be free from forcible intrusions on their bodies against their will, absent a compelling state interest.'" *Mitchell v. City of Benton Harbor*, 137 F.4th 420, 430 (6th Cir. 2025) (quoting *Guertin v. State*, 912 F.3d 907, 919 (6th Cir. 2019)). "To establish a constitutional violation, a plaintiff must demonstrate not only that her bodily

integrity was infringed, but also that it was infringed by government officials' discretionary, 'constitutionally repugnant' actions." *Ibid.* (quoting 912 F.3d at 922). "Actions are constitutionally repugnant in the context of a bodily integrity violation when they 'shock the conscience.'" *Ibid.* (quoting *Lillard v. Shelby Cnty. Bd. of Educ.*, 76 F.3d 716, 725 (6th Cir. 1996)). "Merely negligent conduct does not shock the conscience, but unjustifiable and intentionally injurious conduct usually does." *Ibid.* (citing *Guertin*, 912 F.3d at 923). "When conduct falls somewhere between these bookends — in the neighborhood of recklessness or gross negligence — [the Court] evaluate[s] the conduct in context to determine if the official was deliberately indifferent to a known risk of harm, for 'what may constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial.'" *Id.* at 430-31 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998)) (cleaned up). "Among these considerations are 'the time for deliberation, the nature of the relationship between the government and the plaintiff, and whether a legitimate government purpose motivated the official's act.'" *Id.* at 431 (quoting *Guertin*, 912 F.3d at 924). "When, for example, a government official acts recklessly during a fast-paced car chase or amid a prison riot, [courts are] unlikely to find that he was deliberately indifferent to a known risk of harm." *Ibid.* (citing *Lewis*, 523 U.S. at 852-53; *Whitley v. Albers*, 475 U.S. 312, 320 (1986)). "But when officials have time to consider their actions, but nonetheless subject individuals to an unjustified risk of harm, their behavior is more likely to offend the Constitution." *Ibid.*

The plaintiffs rely in part on *White v. Harmon*, 65 F.3d 169, 1995 WL 518865 (6th Cir. 1995), to support their constitutional argument. That case, however, was based on a Fourth Amendment violation. *See* 1995 WL 518865, at *3 ("Clewett, who himself had virtually no

canine-handling training, then brought the dog, which Clewett knew had bitten someone on a previous occasion, into the immediate presence of the handcuffed plaintiff the dog was 'tracking'; close enough to permit the dog to bite the plaintiff. A reasonable officer would understand that those facts constitute an objectively unreasonable seizure."). They make no other effort to engage on a Fourteenth Amendment analysis.

The plaintiffs also face another hurdle with their federal claim against the City, since the municipality cannot be held liable solely based on Kupser's conduct. It is well known that a municipality cannot be held vicariously liable on federal constitutional claims based on the conduct of their employees. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (holding that "a municipality cannot be held liable [under section 1983] solely because it employs a tortfeasor — or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory"). Instead, to prevail on a claim for municipal liability, the plaintiffs must prove the existence of "an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

The plaintiffs have not offered evidence sufficient to create a material fact question on any of the theories that might show a constitutionally illegal policy or custom perpetrated by the City.

The failure to train equates to deliberate indifference if a plaintiff offers evidence that demonstrates either "a pattern of similar constitutional violations by untrained employees and [the defendant's] continued adherence to an approach that it knows or should know has failed to prevent tortious conduct by employees, thus establishing the conscious disregard for the consequences of

- 10 -

its action . . . necessary to trigger municipal liability"; or "a single violation of federal rights, accompanied by a showing that [the defendant] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 738-39 (6th Cir. 2015) (cleaned up); *see also City of Canton v. Harris*, 489 U.S. 378, 388-90 (1989). To proceed on a failure-to-train theory, the plaintiff must show "that [the defendant] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Shadrick*, 805 F.3d at 738-39. That, in turn, requires a showing that it is "obvious that the failure to train will lead to certain conduct, and [that it is] obvious (i.e., clearly established) that the conduct will violate constitutional rights." *J.H. v. Williamson County*, 951 F.3d 709, 721 (6th Cir. 2020) (quoting *Arrington-Bey*, 858 F.3d at 995). In other words, the plaintiff must prove that "the inadequacy [of training] was closely related to or actually caused the injury." *Jackson v. City of Cleveland*, 925 F.3d 793, 834 (6th Cir. 2019) (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006)).

Here, the plaintiffs have not identified any pattern of constitutional violations that preceded the dog bite incident, and which could be perceived as prompting a need for additional training. First, the plaintiffs do not assert — nor could they, with any solid factual or legal backing — that the incident where Vale bit a fellow officer during a building search, when he was commanded by Kupser to search the premises and bite anyone found inside, was a violation of anyone's constitutional rights under any established legal standard. Second, the plaintiffs have not presented any evidence rebutting Kupser's testimony that on that occasion the dog did exactly as he was instructed, and that it was the officers' own mistake in conducting a building search with the dog while officers were inside the premises that led to the intentional (and authorized) but misdirected

bite of a fellow officer by the dog.  The plaintiffs have not explained how that incident put anyone on notice of the need for additional training to foreclose any constitutional violations.

Moreover, the other two incidents described by the plaintiffs, in which Vale "barked" or "growled" or "grabbed the sleeve" of a child on two other occasions, did not involve any injury of anyone, and the plaintiffs also have not explained how those incidents involved any constitutional injury to any persons which should have put department decisionmakers on notice of the need for remedial training to foreclose a recurring pattern of constitutional injuries.

Finally, the plaintiffs make no effort to identify any individual with decision-making authority who was contemporaneously aware of any of the supposed incidents of aggression, or all of them together.  They have not pointed to any testimony by anyone specifically identifying which decisionmaker in the department was aware of those incidents and chose, despite that awareness, to forego requiring additional training.

The plaintiffs' effort to expound a "failure to investigate" or "ratification" theory of liability against the City also fails.  "To establish *Monell* liability for ratification based on a failure to investigate, a plaintiff needs to show 'not only an inadequate investigation in this instance,' but also 'a clear and persistent pattern of violations' in earlier instances." *Hart v. Michigan*, 138 F.4th 409, 425 (6th Cir. 2025) (quoting *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 495 (6th Cir. 2020)). The earlier inadequate investigations must concern "comparable claims." *Pineda*, 977 F.3d at 495 (quoting *Stewart v. City of Memphis*, 788 F. App'x 341, 344 (6th Cir. 2019)).  This requirement flows from section 1983's causation element, which requires that "there . . . be a link between the local entity's failure to investigate and the plaintiff's injury." *Ibid.* (cleaned up).  It is not enough to put forth evidence that an investigation was haphazard or that its conclusions were flawed, and instead what must be shown is that the responsible policy maker failed to take meaningful action

in response to the report of a constitutional violation. *See Groth v. City of Birmingham*, 761 F. Supp. 3d 1031, 1059 (E.D. Mich. 2025) ("That the investigator found the use of force appropriate — a conclusion that may be incorrect — does not suggest that the City failed to take meaningful action.").

Again, the plaintiffs have failed to identify any "clear and persistent pattern" of constitutional injuries — in fact, they have not identified even a single prior incident that involved any constitutional injury to any persons at all. Moreover, they have made no effort to identify any responsible individual decisionmaker who supposedly was aware of any or all of the incidents in question and elected to ratify unconstitutional conduct by failing to conduct any adequate investigation or to impose appropriate corrective measures.

The federal claim against the City will be dismissed.

### B.

The federal claim against defendant Kupser also faces insurmountable hurdles. Kupser argues that he is entitled to qualified immunity from that claim.

It is well established that qualified immunity insulates state actors from liability so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Once the qualified immunity defense is raised, the plaintiff "must show that (1) the defendant violated a constitutional right and (2) that right was clearly established." *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016) (citing *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013)). This defense requires a close look at the contours of each of the constitutional rights asserted by the plaintiffs; the "court must not 'define clearly established law at a high level of generality.'"

- 13 -

*Tlapanco v. Elges*, 969 F.3d 638, 649 (6th Cir. 2020) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)).

As mentioned above, the plaintiffs' briefing is entirely unhelpful to advance a Fourteenth Amendment invasion-of-bodily-integrity claim.  The plaintiffs barely acknowledge the elements of this claim in their opposition, instead citing a series of cases that are of no legal relevance, since all of the cases on which they rely concerned claims for use of excessive force through intentional deployment of K-9 units during the execution of an arrest or apprehension of a fleeing suspect.  It is undisputed here that nobody was arrested, and Vale was not intentionally deployed by Kupser to exercise force against anyone at the time when the dog approached and bit A.N.  Cases establishing constitutional parameters for the use of K-9 units in the guise of force to execute an arrest simply have no bearing here.

Moreover, even if some facially valid cause of action was made out here, the plaintiffs have failed to identify any line of decisional law placing Kupser on notice at the time that his conduct transgressed constitutional norms.  The plaintiffs point only to decisions involving the intentional deployment of K-9 units during the execution of an arrest or the apprehension of a fleeing suspect, and holding that such force may be unreasonable when suspects who are nonviolent and suspected only of trivial offenses are viciously restrained by police dogs.  But the plaintiff "must show that (1) the defendant violated a constitutional right and (2) *that right was clearly established*." *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016) (citing *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013)) (emphasis added).  This defense requires a close look at the contours of each of the constitutional rights asserted by the plaintiff; [and] the "court must not 'define clearly established law at a high level of generality.'" *Tlapanco v. Elges*, 969 F.3d 638, 649 (6th Cir. 2020) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)) (emphasis added).  The plaintiffs'

cases are entirely unhelpful on this score, since none of them involved claims of deliberate indifference or officials subjecting persons to state-created dangers prosecuted under the due process rubric of the Fourteenth Amendment.  No reasonable officer in Kupser's position in January 2024 could have been expected to benchmark his conduct against a body of law framed by either the Fourth or Fourteenth Amendment regulating intentional uses of force during an arrest or apprehension and to divine the boundaries of acceptable conduct for handling a police dog within the confines of a secured police department workplace, where at the time there were no criminal suspects anywhere in sight and no arrest or apprehension underway.

Even if the plaintiffs had made out some colorable claim for constitutional liability, they have failed to identify any body of law putting Kupser on notice that his conduct was constitutionally censurable.  Kupser is entitled to judgment as a matter of law on the Fourteenth Amendment bodily integrity claim brought via 42 U.S.C. § 1983.

C.

The plaintiffs also bring claims against the City and Kupser under state law.  Federal courts have supplemental jurisdiction over state claims if they are "so related to" the federal claims over which the court has original jurisdiction "that they form part of the same case or controversy."  28 U.S.C. § 1367(a).  In this action, the Court has subject-matter jurisdiction under 28 U.S.C. § 1331 over the plaintiffs' section 1983 claims.  Their state claims under Michigan law are related to the federal claims because they arise from the same factual circumstances.

Ordinarily, when the Court "has dismissed all claims over which it has original jurisdiction," it has discretion to dismiss or remand, as the case may be, the state law claims.  28 U.S.C. § 1367(c)(3).  In exercising this discretion, courts are to consider several factors, including whether declining jurisdiction would lead to wasteful proceedings due to the overlap between state

- 15 -

and federal law, whether it would cause unfairness to a party, whether it would undermine federal-state comity, and whether a party has manipulated the case to reach the federal forum. *See Gamel v. City of Cincinnati*, 625 F.3d 949, 951-52 (6th Cir. 2010). But even where all federal claims have been dismissed, the district court properly may retain state law claims in light of specific circumstances where, for instance, the Court "'[is] familiar with the facts of the case and already ha[s] invested significant time in the litigation.'" *Id.* at 952 (quoting *Harper v. AutoAlliance Intern., Inc.*, 392 F.3d 195, 211-12 (6th Cir. 2004)).

The Court has subject matter jurisdiction over the plaintiffs' remaining state law tort claims because at the time the complaint was filed the Court had original jurisdiction over the section 1983 claims, and the remaining state tort claims arise out of the same operative facts and substantive legal dispute, making it "so related to [that claim] that [it forms] part of the same case or controversy under Article III." 28 U.S.C. § 1367(a). Moreover, the Court sees no good reason why it should exercise its discretion to remand the remaining state law claim rather than proceeding to a final resolution of the matter before this Court, especially where none of the parties have objected to the continued exercise of the Court's supplemental jurisdiction. The Court's continued exercise of jurisdiction over the plaintiffs' state law claims would serve the interests of judicial economy, convenience, and fairness, in particular because the Court is familiar with the facts of the case and has invested some time already in addressing and deciding the defendants' summary judgment motion, and, due to the outcome of the rulings on the federal claims, no further factual development will be necessary.

1.

The plaintiffs have asserted a claim against the City under Michigan's strict liability dog bite statute. Under that law, "[i]f a dog bites a person, without provocation while the person is on

- 16 -

public property, or lawfully on private property, including the property of the owner of the dog, the owner of the dog shall be liable for any damages suffered by the person bitten, regardless of the former viciousness of the dog or the owner's knowledge of such viciousness." Mich. Comp. Laws § 287.351(1). "The purpose of the dog-bite statute appears to be to hold the owner of a dog liable for bite injuries to a lawful victim who did not provoke the dog." *Koivisto v. Davis*, 277 Mich. App. 492, 497, 745 N.W.2d 824, 828 (2008).

The City responds that it is entitled to governmental immunity from that claim. Under Michigan law, "[a]s a general rule, 'a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function.'" *Rowland v. City of Detroit*, No. 372120, 2025 WL 2638938, at *3 (Mich. Ct. App. Sept. 12, 2025) (quoting Mich. Comp. Laws § 691.1407(1)).

The plaintiffs present no opposition to the City's claim of governmental immunity against the only state law claim pleaded against the City in Count I. Here, it is undisputed that the operation of a police department is a governmental function, and the plaintiffs present no argument against the City's assertion of the immunity defense. Therefore, Count I against the City of Lincoln Park will be dismissed.

2.

The plaintiffs also assert a claim under the same statute against defendant Kupser, and he also claims governmental immunity. Michigan's governmental immunity law protects municipal officers from suit, where it "provides that 'each . . . employee of a governmental agency . . . is immune from tort liability for an injury to a person . . . caused by the . . . employee . . . while in the course of employment' if certain requirements are met." *Rowland*, 2025 WL 2638938, at *3 (quoting Mich. Comp. Laws § 691.1407(2)(c)). "The key condition is that the 'employee's . . .

- 17 -

conduct does not amount to gross negligence that is the proximate cause of the injury or damage,' which is known as the 'gross negligence exception.'" *Ibid.*

The plaintiffs contend that Kupser is not eligible for governmental immunity because he is guilty of gross negligence. In fact, they include a separate count in their complaint labeled "gross negligence." But Michigan law does not recognize a free-standing gross negligence claim. *Herriges v. Cnty. of Macomb*, No. 19-12193, 2020 WL 3498095, at \*10 (E.D. Mich. June 29, 2020). "Allegations of gross negligence derive their relevance from the need to plead around certain defenses," like governmental immunity. *Ibid.* Claims labeled "gross negligence" are assessed as claims of ordinary negligence, "using traditional tort principles without regard to the defendant's status as a government employee." *Rakowski v. Sarb*, 269 Mich. App. 619, 628, 713 N.W.2d 787, 794 (2006) (citing *Beaudrie v. Henderson*, 465 Mich. 124, 134, 631 N.W.2d 308, 313 (2001)).

Gross negligence "means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws § 691.1407(8)(a). This description of gross negligence "suggests 'almost a willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks.'" *Wood v. City of Detroit*, 323 Mich. App. 416, 424, 917 N.W.2d 709, 714 (2018) (quoting *Tarlea v. Crabtree*, 263 Mich. App. 80, 90, 687 N.W.2d 333 (2004)). It also requires a showing of proximate causation, which means "whether it was foreseeable that the defendant's conduct could result in harm to the victim." *Ray v. Swager*, 501 Mich. 52, 65, 903 N.W.2d 366, 372 (2017).

The Sixth Circuit has stated that gross negligence claims are not barred when plaintiffs ground their negligence claim in a defendant's "fail[ure] to follow certain procedures and statutory obligations" or otherwise demonstrate "that the defendant owed [the plaintiff] a duty of care."

- 18 -

*Brent v. Wayne Cnty. Dep't of Hum. Servs.*, 901 F.3d 656, 701 (6th Cir. 2018). Instead, the claim is treated as an ordinary negligence claim. And the Sixth Circuit has found allegations that a defendant "breached his 'duty to perform [his] employment activities so as not to endanger or cause harm to Plaintiffs' . . . sufficiently distinct from . . . separately-pleaded intentional torts." *Richards v. City of Jackson*, 788 F. App'x 324, 337 (6th Cir. 2019).

But that brings us back to the governmental immunity defense, which would insulate Kupser from an ordinary negligence claim as well as the claim under the dog bite statute. The plaintiffs do not dispute that at the time of the bite incident, Kupser was acting "in the course of his employment" while performing official duties as a detective. Kupser is entitled to governmental immunity against the state law claims because the plaintiffs have not rebutted the undisputed evidence which demonstrates that at the time of the incident he was not engaging in any conduct that was so "reckless" as to demonstrate a "substantial lack of concern" for whether an injury to a person would result.

The plaintiffs have not rebutted Kupser's testimony that while at work he kept Vale in his office, in a keycard-secured area of the police station that is not open to the public. There is no evidence suggesting that Kupser had any knowledge that A.N. would be present in the vicinity around the shift change on the date and time in question, and Nicklas testified that he was at the police station on personal business to exchange parental custody of his daughter. Kupser testified that Vale was thoroughly trained, and that he and Vale were certified to perform K-9 police duties. As part of that training, the dog was trained not to bite anyone unless commanded to do so, and he was trained only to obey Kupser's commands. The plaintiffs have not rebutted that assertion with evidence of their own.

- 19 -

The prior incidents of "aggression" do not supply any evidence suggesting any awareness by Kupser of an unreasonable danger of injury resulting from leaving the dog unattended in his office.  On the one occasion where Vale bit anyone, Kupser testified that the dog performed precisely as commanded and bit a fellow officer only because that officer was within a search area, where he should not have been during the K-9 incursion.  That incident, where the dog performed exactly as he was trained and commanded, is not any basis for a suspicion that his "aggression" posed a danger to anyone in circumstances where he was not commanded to bite.  There is no evidence that either of the other two incidents alluded to by the plaintiffs involved any injury to anyone, and those also do not supply any basis for a conclusion that Kupser acted in a "reckless" manner by leaving the dog unrestrained in his office, in a secured area where members of the public and children were not usually present.

The plaintiffs have not identified any evidence showing that Kupser acted in a grossly negligent manner in his handling of the dog, and Kupser therefore is entitled to governmental immunity against the state law tort claims.

The plaintiffs push back with an argument, unsupported by any citations of legal authority on point, that the dog-bite statute constitutes an "exception" to governmental immunity.  But the statute confers broad immunity against all tort claims "'*[e]xcept as otherwise provided in this act.*'"  *Rowland*, 2025 WL 2638938, at *3 (quoting Mich. Comp. Laws § 691.1407(1)); *see also* Mich. Comp. Laws § 691.1407(2) ("*Except as otherwise provided in this section*, . . . each officer and employee of a governmental agency, each volunteer acting on behalf of a governmental agency, and each member of a board, council, commission, or statutorily created task force of a governmental agency is immune from tort liability.").  The plaintiffs do not point to any provision of the immunity statute recognizing claims under the dog-bite strict liability statute among the

enumerated exceptions to governmental immunity, and they have not cited any cases on point holding that the dog-bite statute constitutes such an exception. *See Mann v. City of Detroit*, 21 N.W.3d 451, 2025 WL 1658271 (Mich. 2025) ("*Unless an exception applies*, the governmental tort liability act (GTLA), Mich. Comp. Laws § 691.1401 *et seq.*, *provides immunity from tort liability* for governmental agencies 'engaged in the exercise or discharge of a governmental function.' *This immunity is broad, and the statutorily created exceptions to immunity are narrowly construed.*") (emphasis added).

One final point on the state law statutory claim against Kupser, Michigan's dog bite statute imposes liability only upon the "owner" of the dog. Mich. Comp. Laws § 287.351(1) (stating that when a person is bitten by an unprovoked dog, "the owner of the dog shall be liable for any damages suffered by the person bitten"); *Koivisto v. Davis*, 277 Mich. App. 492, 497, 745 N.W.2d 824, 828 (2008) ("The purpose of the dog-bite statute appears to be to hold *the owner* of a dog liable for bite injuries to a lawful victim who did not provoke the dog.") (emphasis added). The defendants admit that in the course of their assigned duties, Kupser took Vale home with him at the end of his shifts and cared for the dog outside of work hours. However, they contend that merely caring for and housing a dog is not sufficient to constitute legal "ownership," citing *Foster v. Szlaga*, No. 324837, 2016 WL 805583, at *6 (Mich. Ct. App. Mar. 1, 2016) ("[N]othing in the plain language of the statute . . . support[s] an interpretation that simply possessing, keeping, and taking care of a dog constitutes ownership for purposes of MCL 287.351(1)."). That non-binding unpublished decision by the Michigan Court of Appeals may not be controlling on the point, but the plaintiffs have not pointed to any direct testimony or documentary evidence demonstrating that defendant Kupser asserted legal ownership of the dog at any time before Vale's "retirement" from K-9 duty in January 2025. The plaintiffs point to nothing more than an unadorned assertion in the

defendant's earlier brief filed in state court that the City was "not the owner" of the dog, but that previous expression of the City's litigation position was not associated with any citation of any record evidence.  And the City's disclaimer of ownership is not evidence that *Kupser* was the owner.  In the absence of any actual evidence supporting their position on the dog's ownership, the plaintiffs have failed to carry their burden of rebutting the defendants' evidence with contrary evidence of their own.

The plaintiffs have failed to demonstrate that any genuine issue of material fact remains for trial on each of the elements of their state law claims or to overcome the state law immunity defenses.  Therefore, the defendants are entitled to summary judgment on the state law claims against them.

## III.

The plaintiffs have not shown that the record supports any material fact questions on their federal or state law claims, or that fact questions remain on the immunity defenses raised by the defendants.

Accordingly, it is **ORDERED** that defendants' motion for summary judgment (ECF No. 22) is **GRANTED**.

It is further **ORDERED** that the complaint is **DISMISSESD WITH PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   July 23, 2026

- 22 -